May it please the Court, Michael Satchers on behalf of the appellant, Clarence Ray Allen. I'd like to reserve five minutes for rebuttal, if I may. Ray Allen was deprived of a fair and reliable death determination by the jury in two very fundamental ways. First, there's a reasonable likelihood that this jury never made the kind of normative, subjective, moral determination that California calls for, which is, was the death penalty for Ray Allen appropriate under all of these circumstances? Instead, it's likely that they made the death determination, whether Ray Allen should live or die, dependent upon the mandatory formula of whether aggravation outweighed mitigation. Even if the jury did answer the right question in this case of whether death was appropriate for Ray Allen, it did so in ignorance of substantial bases that favored a choice of life in this case. In fact, it did so in ignorance of virtually all of the evidence that favored life in this case. They were ignorant of that because of the deficiencies of counsel. This is a performance by counsel that if you look at the spectrum of what you expect from trial counsel at the penalty phase, was at the nadir. It was at the very bottom. The Court found that the trial attorney literally did not even think about the penalty trial until the jury verdicts of guilt were in hand. And obviously, with the penalty trial right around the corner, it was way, way too late on any practical basis to prepare a meaningful case for life. And in fact, all trial counsel did in the end was present one witness who provided narrow testimony, Diane Harris, in mitigation. It was a case for life that the prosecution was able to present one. Were there two witnesses, John Plemons? I'm sorry? Were there two witnesses that the defense counsel presented? Yes, there was another witness that went to rebut the aggravating evidence of the jail assault. That was defending against further aggravation. But in terms of presenting a positive case for life, there was the single witness. And it allowed the prosecution to argue fairly to the jury that this evidence presented by this witness was a mole lump of mitigation at best. It was evidence that was almost invisible that was as good as no evidence in mitigation. And that's certainly what the district court found in this case. And what the court also found was that there was a mountain of evidence that favored the defendant in mitigation of the penalty that could have been presented. The court heard it over six days of testimony from 17 live witnesses and considered another nine witnesses. Over 25 family members and friends of Ray Allen were prepared and did testify about the extent of his goodness and positive values and life-affirming qualities. So that the prosecutor, of course, exploited the absence of that kind of evidence. Not only did it argue there's no evidence in mitigation presented, but asked the jury where are the friends and family of Ray Allen to say anything good about him. Counsel, I think the most difficult part of this case to me, not speaking for the other panel members, is the question whether the absence of that evidence was prejudicial or whether the particular circumstances of the killings and the particular circumstances of aggravation were so significant that Clarence Darrow himself could not have made any difference with 50 live witnesses, that it was just that bad. And that also is among the district court's very careful conclusions. And I wonder if you'd speak to that. Yes. That is a conclusion of law that's subject to de novo review here. It is the naughtiest legal question, and it is the question on which the district court fell. When it concluded along the lines of what Your Honor is suggesting, and in terms of what the district court said, was as important as this evidence was, and it found it was important, as touching as this evidence was, and it found it was touching evidence, and as especially valuable as this evidence was, and it found this evidence was especially valuable. When you compare it to the aggravation in this case, which was potentially extraordinary, it pales by comparison. It like disappears. It's overwhelmed by the aggravation. In part, the particular thing that is of most concern to me, very often it seems to me a reasonable pitch can be made to say, choose life for this defendant because he'll be behind bars for the rest of his life, and what harm can he do? Well, that argument surely was not available here, because that's precisely what he was convicted of doing was reaching out from prison where he was already serving a life term and arranging for the deaths of other people. So because of that peculiarity in the case, I wonder if anyone could have made a successful argument to spare him. Well, a couple of things there is that there was part of the mitigation evidence that could have been presented was his good conduct in prison for many years, his work habits there. Wasn't that disvalide by the very nature of the offense at issue, that the jury had just returned, you know, three death verdicts? But you also had lingering doubt as to that aggravation evidence that could have been effectively presented, where you say that evidence was all based from unreliable sources. This jury was out for four days grappling over that evidence. There was a lot of evidence that that killing in Franz Market arose out of this drug craziness in Fresno. And so, jury, you have found guilt, yes, but there's a lingering doubt here as to whether this crime was actually committed by Ray Allen. So that when you put that lingering doubt together with the evidence that was present, that could have been presented about the fact that this is a guy who's behaving himself in prison. He's not getting in trouble. He's helping to run the prison during their times of security, which the evidence would have showed. And on top of that, you have a whole history of good, favorable conduct that when you put the two of those together could have further reinforced and bolstered and complemented the lingering doubt that did remain in this case. I understand that this is a pre-EDPA case. And so we do not give the State Court of Appeals decision the same kind of presumption of factual correctness. We are required to give some deference to the state court findings of fact. And the court actually found that he had orchestrated an assault, a pretty serious assault, on a fellow inmate while he was in prison. In the county jail? Right. Well, that's if you believe the evidence. We don't know that the jury believed that evidence. On our standard of review, we have to give some presumption to that finding. We don't know that there was that finding. There was prosecution evidence in support of that allegation, but there was a substantial defense case to that. And, of course, one of the other issues in this case is the trial court excluded evidence that, in fact, Ray Allen was a conforming good inmate in the county jail during that period of time. So you do have the kind of cumulative prejudice that occurred here. What do you think was the most – this case, here's where I'm in trouble about this case. In terms of the potential, the nature of the mitigation evidence, it's unlike, say, the nature of the evidence in Mayfield, which was our recent en banc decision where a lot of the humanizing testimony was contemporaneous with the commission of the crime and there was all sorts of other things at issue, drug abuse, mental illness, low IQ, et cetera. What do you think was, in this case, on the side of life, the most compelling evidence of mitigation? It was really the entirety of it. What was most compelling and what the mitigation expert in this case said was the extraordinarily powerful mitigation of the sort that one rarely encounters in this kind of litigation is how there were so many people that came from so many walks of life to say so many positive things about Ray Allen. I mean, you can go back to the fact he grew up in an impoverished, completely poverty-stricken area as a Native American who was pushed off to the marginalized land of Oklahoma, who left school in the third grade to help his parents eke out a living as migrant farmers, who was then terribly traumatized or affected by the loss of his young sister from leukemia at a very early age, who then was living in a chicken shack as a good man, a good father and son, who became a preacher living a life of Christian values and preaching the same, who saved the life of a fellow employee, who did all kinds of other acts of goodness and kindness and generosity that were spoken to, who even while he was in prison, again, was a positive influence on many others, people that would then be harmed themselves and pained by his death. You have the compelling testimony of the retarded daughter who testified at the evidentiary hearing, who was the daughter of Ray Allen's ex-wife whose father had abandoned her, and Ray Allen embraced her and was like a father to her. And you put in all of those facts, and the question, as Williams versus Taylor made clear, isn't, you know, you don't have to address the aggravation case of the prosecution to form a basis for the jury to opt for life. You can develop a case for life mitigation that's independent and will allow the jury, as in Mayfield and the recent case of Douglas, to evoke a sympathetic response to the individual. Where the test is whether this individual should live or die, how can you have a fair and reliable decision if you don't know anything about the defendant in terms of his positive life-affirming values? The problem to say, or part of the problem in saying that this aggravation, as a matter of law, outweighs the mitigation, which is what you have to say, that's a kind of objective standard where we're dealing with subjective determinations here. These are amorphous standards. Well, our standard is that we have to have a firm conviction that what? We have to have a firm conviction that jury would have made the choice of life. No. Have they heard this evidence? No, no. All you have to have is a doubt, a reasonable probability that there was a breakdown. Now, the ultimate determination under Strickland is was there a breakdown in the adversarial process that we count on to produce a fair and just, reliable verdict? Well, we still have to find prejudice, though. We have to conclude that at least one juror would have been swayed by what you're talking about, because if we're firmly convinced that it couldn't have made any difference, then you still can't win, even if counsel below was inadequate. Well, there's counsel below being inadequate. I mean, prejudice is established if you have a breakdown in the adversarial process. But really, one of the problems is this Court cannot say, cannot make that determination that this jury surely would have come back with a death verdict, because that's the ultimate decision is subjective. Well, that argument, it seems to me, goes a little too far, because what that says, if there were only one witness that should have been found that wasn't, and it was kind of crummy witness, well, because it's subjective, we still couldn't say. I don't think that's quite the standard. I mean, Strickland seemed to bar that argument. I mean, Strickland was a death case, and yet it sets up this clear requirement that prejudice be found, that there be a reasonable probability the result would have been different. Now, I share your view that it's more difficult in a jury context on this particular decision, which is in some fashion a non-rational decision. It's not a fact-finding. It's what punishment should be meted out. It's a different kind of decision. And yet Strickland doesn't say that in a death case we'll presume prejudice because it's not the kind of decision we can make. No, we're not talking about presuming prejudice, but we're talking about a case where there was no credible case for life presented at trial, but there was a very substantial case for life that could have been presented. And Strickland talks about this approach is a flexible one, and the ultimate determination is whether he had a fair trial. That's ultimately the prejudice determination, and that's implemented in the Williams decision where the court makes that precise analysis where there was not a credible case given. In that case, too, the trial counsel began to prepare only weeks before penalty face, and there was a lot, substantial volume of evidence as there was in this case. Well, I'll tell you my view. I believe there was an effective assistance, that counsel's performance was deficient in this case. And that's just speaking for me. I'm just struggling with this reweighing that the Mayfield majority says that, you know, we must conduct and the standards that we're supposed to apply to reweighing this. And, you know, how are these things that your mitigation evidence, for example, explanatory of his conduct or exculpatory of his conduct or what argument from this evidence would you make that would say that to the jury, if you were making that argument to the jury, that would persuade him that this evidence would say vote for life? I would make the argument that Ray Allen is not an obscenity on this earth with no redeeming value whose existence should be wiped out, that there are things about Ray Allen that redeem him. He's not a picture of unmitigated evil that, in fact, was allowed to be presented and was presented to the jury in this case. That was the only – that was the picture presented. There was unmitigated evil. He was pure evil. In fact, he has redeeming social qualities. We're talking in this case about the worth of a human life. Is Ray Allen worth saving? Yes, he is because of all of the 5 to 10, 15, 20 things, 25 things we can say about Ray Allen that is good about him so that notwithstanding the crimes that were committed in this case, it doesn't call for the ultimate punishment. That's for the worst of the worst. Give that punishment to Billy Ray Hamilton. He's the one who did this killing, killed these three people. Ray Allen had no reason to kill those two of those youngsters. He had no intention to. But he's responsible for putting Hamilton there. Maybe. It troubles me that Judge Wardlaw makes reference to exculpatory evidence. In so many of these cases, you can talk about either because of mental deficiency or illness or deprivation, a deprived background, which surely Mr. Allen has reason to cite. That kind of can be folded into the crime to make the jury conclude, as our cases directly observe, that in some ways he's somehow less responsible. But this particular crime is so cold and calculating, it seems pretty far removed from your brief talks about the kind of psychological evidence or his background. How would you tie those in to make him any less responsible for being, for setting this engine in motion, for putting Hamilton in a place where he got down not only the past witness but two other people that happened to be there? It seems to be difficult to separate what Mr. Allen did from the punishment that the jury decided to give him. Well, as was talked about in one of the cases that found prejudice, where, again, Blake v. Kemp, that of the Eleventh Circuit, and there's a couple of cases there that I think have the right kind of approach, where there was an entire, entire failure to present evidence. And in that case, there was some character evidence available, much less than was shown in this case. And the Court found prejudice there because, precisely because trial counsel didn't direct the jury's attention away from the crime to special facts about this defendant that might call for a lesser punishment than death. And when you have a number of special facts about the defendant that you can use to direct the jury away from the crime, set a whole different tone to Ray Allen than was presented in this case. The evidence shows that character evidence presented at a penalty phase can be extremely powerful to the jury, precisely because it humanizes the individual so that it gives them pause. Do we really need to send this person to death for his crimes? There's some complexity there. There's some moral ambiguity. There's some dimension to the individual that we should take into consideration. And this Court, although it hasn't always spoken in those terms, it certainly did in Blodgett, where it said that was the killing of 13 individuals by the defendant as the leader in it, where no humanizing evidence is presented, it can be as devastating at the penalty phase as it is to fail to present evidence of innocence at the guilt phase. And this Court has gone on through numerous cases since then in finding that where there are reasonable, substantial bases for a juror, there's no right or wrong decision of a jury to make when they decide to put somebody to death. What's important, what the Supreme Court has said, is that the jury take into consideration, have before them and be allowed to fully play on all those things about the individual that might cause it to conclude that despite the crime, this individual should not be put to death. And where you have an utter failure to make that case, to present anything, to give the jury any reasonable basis, and there was a tremendous amount of evidence that could have been directed to the individual qualities of Ray Allen away from the crime. Of course, the second problem here in terms of the prejudice is the fact that trial counsel botched the lingering doubt defense. The only plank he had was doubt, and that was his default defense because he hadn't presented what he intended to or would have if he had given himself the time. He failed to condition the jury at the time of Wadir that doubt was going to be at issue at penalty phase. He said he'd be presenting evidence about the good things about Ray Allen at the penalty phase. He allowed the prosecution to suggest that once guilt was determined at the guilt phase, that question was over, doubt was no longer at issue at the penalty phase. He didn't ask for an instruction on lingering doubt, which would have advised the jury specifically that this is a legitimate mitigation factor in California, which he could have requested and obtained many courts have so instructed. And then in his closing, what he did and what the California Supreme Court found was his thesis was there was reasonable doubt as to guilt. He shouldn't even have been found guilty by you, this jury, and therefore should not be put to death. And as the district court found in this case, that essentially forfeited his claim of lingering doubt. He didn't speak of it in terms of lingering doubt. What he did was effectively insult the jury and at worst alienated the jury by saying you were wrong. He said, you know, if the defendant was guilty beyond a reasonable doubt, I could do nothing more here than get down on my knees and beg for mercy, which is true because he didn't present the evidence in favor of life. But he says I'm not going to do that because he wasn't guilty beyond a reasonable doubt. Well, he's arguing that to the jury that has just returned a guilt verdict. So that this jury could not act on any impulses that it might otherwise have been fostered to find for life. You may have had death scruple jurors who were very reluctant to impose the death penalty, who you could have have who would have been open to consideration of the evidence of good character and the goodness of Ray Allen. The prosecution was very concerned in voir dire and in closing argument about the juror who might find that because Ray Allen didn't do the actual killings in this case, that Billy Ray Hamilton did, that that was powerful fact in favor of a life sentence. Counsel, you're using your rebuttal time, which you may do, but. Okay. Let me then just speak for two more minutes on why there was prejudice, unreliability on the second aspect that I've referred to today, which is the fact that the jury understood, or there's a reasonable likelihood from the arguments and instruction of counsel, that they were under a mandatory duty to return a verdict of death once they found, if they did find that aggravation outweighed mitigation. Under Sullivan v. Louisiana teaches that if the jury in fact used the wrong standard, you don't have a valid verdict to begin with. You have really a structural defect here because it's not that you have a verdict that has integrity and you look to see whether the error affected it. There's no there there because the jury never made the adequate penalty determination. It requires reversal as a matter of law because they used the wrong standard, a standard to Ray Allen's detriment that allowed them on bases that the court, the law didn't permit, to conclude that Ray Allen should be put to death or even if they held the normative subjective belief that death was not appropriate in this case. So I will reserve the rest of my time. Thank you. Thank you. You may do that. We'll hear from Mr. Campbell. May it please the Court. This case represents an issue that bedeviled death penalty jurisprudence for a long time, and that's whether or not you can have a unique case, a unique situation in which you have a rare, in which involving a rare case, in which no other sanction but execution can be adequate. And it's not just enough that Mr. Allen was serving a life sentence for a murder that, in fact, now would be a capital offense in California, and that he had three more people murdered on the outside, was convicted of conspiring to kill seven people beyond that. It is, in fact, that the motivation of the crime itself was also, in fact, an assault on the body politic on this institution. The challenge for Mr. Allen's attorneys, and they are excellent attorneys and have done an excellent job, is to distract this Court from those crimes. But juries and reviewing courts can and do consider just how terrible the facts are when they're weighing the mitigating evidence. And in this case, you have the triple murder by a man serving a life sentence for murder, a man who had ten prior felony conditions, where ten violent crimes were proven against him in the aggravating case. And the fact is, once you focus on those offenses and that aggravation, it is clear that the mitigation that Mr. Allen's attorneys now claim should have been introduced is so paltry, so much of the ordinary stripe, that it becomes clear that this is, in fact, one of those rare cases in which the death sentence was inevitable because of the aggravating circumstances. It's important to keep in mind that we're here 20 years later, 21 years later. I've been with this case for 22 years. So we're talking about a situation in which a jury would have heard that evidence, it would have been fresh in their minds, and then they would have heard the additional evidence that Mr. Allen's attorneys now propound that, as the district court put it, that Mr. Allen could be pleasant once in a while. But the standard for this Court for determining prejudice is whether or not there's a reasonable probability the outcome would have been different. And the word reasonable is an extremely significant word. It is not an unimportant word. It is not just that some additional evidence might have had a conceivable effect. It is whether or not there's a reasonable probability that the outcome or that the confidence in the outcome could be undermined. The evidence that was introduced at the evidentiary hearing about Mr. Allen's background, his family life, simply is not the stuff that really was going to render him less culpable in the eyes of the jury. It was not the stuff that was going to render him less culpable, or is it enough that the evidence renders him sufficiently more human that one juror might have been motivated to spare his life? Well, certainly I think the language that the courts have used in the past is probably not really clear what they think the jury is exactly measuring there. But certainly what they're talking about there is such that there are factors about the defendant that while he may be a bad person, is he so bad that it's necessary in choosing between a death sentence or a life sentence that the death sentence is, in fact, the only appropriate penalty? The problem for the defendant in this case is that many of the witnesses that they did bring forth were people, as the district court found, who had known Mr. Allen at times in the past. Many of them were not aware of what had happened in the case, were not aware of his own prior crimes and criminal activities. They had known him at times that were remote. Frankly, the district court found that some of these witnesses, no matter what they said now, would not have probably been willing to testify at the time of the case. The significant thing is that what they're asking you here to do is a gamble that there might have been a conceivable effect, that it might have made a difference, but that is not what you're going to measure in this case. It has to be a reasonable probability. It is, in fact, an objective test about a subjective determination. And when you balance the fact that Mr. Allen at times had done acts of generosity over the years and, in fact, that record itself was not a particularly, I think, completely wholesome and pure record when it came out of the evidentiary phase. Of course, we learned about Mr. Allen's prior criminal acts going back for years and years and years and how those acts had increased in seriousness as time progressed, starting out with stealing from farm workers to the culmination with the cases and the murders that we have now. That that type of information itself simply is not appropriate. It does not show himself capable. It's important to keep in mind that at the time of this testimony, the idea why not issue a death sentence for murder would indicate that if you were a life prisoner for murder, the idea why not issue a death sentence for murder would indicate that if you were a life prisoner for murder,
judges: Graber, Wardlaw, Clifton